RANDALL V. SUTTER, State Bar No. 243040
JOHN K. ROUNDS, State Bar No. 170531
ROUNDS & SUTTER, LLP
674 County Square Drive, Suite 108
Ventura, CA. 93003
Telephone:    (805) 650-7100
Facsimile:    (805) 832-6315
Email:        jrounds@rslawllp.com

Counsel for Debtors- in-Possession

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re: | **Case No.: 9:18-bk-10894-DS** |
| | **Chapter 11** |
| **Ronald Palmer,** | |
| **Lola Palmer,** | **DEBTORS' CHAPTER 11 PLAN OF REORGANIZATION** |
| Debtor(s). | |
| | **Plan Confirmation Hearing**<br>Date:  TBD<br>Time:<br>Place: 1415 State Street<br>         Courtroom 201<br>         Santa Barbara, CA 93101 |

# **TABLE OF CONTENTS**

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARTICLE I:  TREAMENT OF UNCLASSIFIED CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

   A.     Administrative Priority Claims. ............................................................................................. 2

   B.     Priority Tax Claims ............................................................................................................. 2

   C.     Involuntary Gap Period Claims .......................................................................................... 3

ARTICLE II:  TREATMENT OF CLASSIFIED CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

   A.     Class 1: Priority Unsecured Claims. .................................................................................. 3

   B.     Secured Claims on Debtors' Principal Residence. ............................................................ 4

      1.    Unimpaired secured claims on Debtor's principal residence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      2.    Impaired Secured Claims on Debtors' Principal Residence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

   C.     Unimpaired Secured Claims on Property Other than the Debtors' Principal Residence. ................................. 4

   D.     Unimpaired Secured Claims on Collateral to be Surrendered by Debtor. ......................... 6

   E.     Impaired Secured Claims on Property Other than the Debtors' Principal Residence ...................... 7

   F.     General Unsecured Claims ............................................................................................... 10

ARTICLE III: ALLOWANCE AND DISALLOWANCE OF CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

   A.     Disputed Claim. ............................................................................................................... 11

   B.     Delayed Distribution on Disputed Claims. ....................................................................... 11

   C.     Settlement of Disputed Claims. ........................................................................................ 11

ARTICLE IV: EXECUTORY CONTRACTS AND UNEXPIRED LEASES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

   A.     Executory Contracts and Leases Assumed. ....................................................................... 11

   B.     Executory Contracts and Leases Rejected. ........................................................................ 11

ARTICLE V: MEANS OF IMPLEMENTATION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

   A.     Funding for the Plan: ....................................................................................................... 12

      1.    Available Cash. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

      2.    Sale of Assets. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

      3.    Future disposable income. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

---

INDVIDUAL DEBTORS' CHAPTER 11 PLAN OF REORGANIZATION

4.    Other Sources of Funding ......................................................... 13

B.    Post-Confirmation Management............................................................................ 13

C.    Disbursing Agent.................................................................................................... 13

ARTICLE VI: DISCHARGE AND OTHER EFFECTS OF CONFIRMATION ......................... 13

A.    Discharge................................................................................................................. 13

B.    Revesting of Property in the Debtor. ..................................................................... 13

C.    Plan Creates New Obligations. .............................................................................. 13

D.    Creditor Action....................................................................................................... 14

E.    Retention of Jurisdiction........................................................................................ 14

F.    Post-Confirmation Status Report. .......................................................................... 14

G.    Quarterly Fees ........................................................................................................ 14

H.    Post-Confirmation Conversion/Dismissal ............................................................ 14

I.    Final Decree. .......................................................................................................... 15

ARTICLE VII: GENERAL PROVISIONS ................................................................... 15

A.    Definitions and Rules of Construction.................................................................... 15

B.    Effective Date of Plan. ........................................................................................... 15

C.    Cramdown. .............................................................................................................. 15

D.    Binding Effect. ........................................................................................................ 15

E.    Captions................................................................................................................... 15

F.    Controlling Effect.................................................................................................... 16

# INTRODUCTION

Ronald and Lola Palmer ("Debtors") are the Debtors in a Chapter 11 bankruptcy case. On June 4, 2018, this case was commenced by the filing of a Voluntary Petition for relief under the United States Bankruptcy Code ("Code"), 11 U.S.C. §101 et. seq.. This document is the Debtors' Chapter 11 Plan of Reorganization ("Plan") proposed by the Debtors ("Plan Proponent"). Enclosed in the same envelope as this document is the Disclosure Statement which has been approved by the court, and which is provided to help you understand the Plan.

This is a reorganizing plan. The Proponent seeks to accomplish payments under the Plan by making payments to the various creditors. All Creditors should refer to Articles I-IV of this Plan for the precise treatment of their claims. The Effective Date of the proposed Plan is fourteen (14) days after entry of an Order by the Court confirming the Plan.

If confirmed, the Plan will bind all creditors provided for in the Plan, whether or not they file a proof of claim, accept the Plan, object to confirmation or have their claims allowed. Your rights may be affected. **You should read these papers carefully and discuss them with your attorney, if you have one.**

# CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

As required by the Bankruptcy Code, the Plan classifies claims and interests in various classes according to their right to priority of payments as provided in the Bankruptcy Code. The Plan states whether each class of claims or interests is impaired or unimpaired. The Plan provides the treatment each class will receive under the Plan.

# ARTICLE I
## TREAMENT OF UNCLASSIFIED CLAIMS

Under 11 U.S.C. section 1123(a)(1), the following types of claims are not classified and are not entitled to vote on confirmation of the Plan: (i) administrative expense claims allowed under section 503(b) and entitled to priority under section 507(a)(2) (including the claims of professionals, United States Trustee quarterly fees, and post-petition domestic support

---

obligations); (ii) involuntary gap period claims under section 507(a)(3); and (iii) priority tax claims under section 507(a)(8). These claims shall be treated as follows:

**A.   Administrative Priority Claims.**

Professional Fees may only be paid upon application and approval by the Court, Debtor will pay professional fees in full in cash on the later of (i) the Effective Date or (ii) upon court order, except to the extent that a holder of such claim agrees to other terms. *Claimant: Rounds & Sutter, LLP - $37,789.50 (estimated), subject to court approval.*

To date, Debtors have only paid Counsel $13,717.00 which includes a $1,717.00 filing fee.

Court Approval of Fees Required:

The Court must rule on all fees listed in this chart before the fees will be owed. For all fees except Clerk's Office fees and U.S. Trustee fees, the professional in question must file and serve a properly noticed fee application and the Court must rule on the application. Only the amount of fees allowed by the Court will be owed and required to be paid under this Plan.

**B.   Priority Tax Claims**

Priority tax claims are certain unsecured income, employment and other taxes described by Code §507(a)(8). The Code requires that each holder of such a §507(a)(8) priority tax claim receive the present value of such claim in deferred cash payments, over a period not exceeding six years from the date of the filing of the petition in this case.

The following lists all the Debtors' §507(a)(8) priority tax claims and their treatment under the Plan:

The Internal Revenue Service had filed a proof of claim in the amount of $3,284.22 (Claim 5). If the IRS does not withdraw its claim following Debtors' filed tax return, Debtors will pay the claimed IRS amount in full on confirmation.

**C.   Involuntary Gap Period Claims**

Holders of involuntary gap period claims allowed under § 502(f) are entitled to priority under § 507(a)(3). Such claims will be paid in full on, or as soon as is practicable, after the

INDVIDUAL DEBTORS' CHAPTER 11 PLAN OF REORGANIZATION

Effective Date. Involuntary gap priority creditors exist only in cases commenced involuntarily. These are creditors who have claims that arose after the involuntary petition was filed but prior to the court's appointing a trustee or granting an order for relief.

The Debtors have no involuntary gap period claims.

**D.    Domestic Support Obligations**

Domestic support is child or spousal support. Debtors have no domestic support obligations.


## ARTICLE II

## TREATMENT OF CLASSIFIED CLAIMS

**A.    Priority Unsecured Claims.**

Certain priority claims that are referred to in Code §507(a)(3), (4), (5), (6), and (7) are required to be placed in classes. These types of claims are entitled to priority treatment as follows: the Code requires that each holder of such a claim receive cash on the Effective Date equal to the allowed amount of such claim. However, a class of unsecured priority claim holders may vote to accept deferred cash payments of a value, as of the Effective Date, equal to the allowed amount of such claims. The following is a list of all classes containing Debtor's §507(a)(3), (4), (5), (6), and (7) priority unsecured claims and their treatment under this Plan.

The Debtors have no non-tax priority creditors.

**B.    Creditors Holding a Security Interest in Property**

**Class 1: U.S. Bank, Holder of First Trust Deed**

Debtors are the sole owners of the Property, which is Debtors' residence. The Property has a fair market value of $2,000,000.00 million.

U.S. Bank is the lienholder on the Property by virtue of a first deed of trust recorded with the Los Angeles County Recorder's Office on September 6, 2002.

This debt was incurred in August 2002 in the original principal amount of $1,000,000.00. The loan was incurred in order to fund renovations on other properties located in and around Palm Springs, CA. On the petition date, Debtors owed approximately $1,138,111.80.

---

INDVIDUAL DEBTORS' CHAPTER 11 PLAN OF REORGANIZATION

On April 12, 2019, Debtors and U.S. Bank entered a stipulation whereby Debtors would continue monthly payments of $6,070.99 for principal, interest, and escrow on the first of every month starting on April 1, 2019. Pursuant to the terms of the stipulation, the payments would continue for twelve (12) months during which time Debtors would be required to sell or refinance the Property by March 15, 2020. Debtors will continue to pay U.S. Bank pursuant to the stipulation and cure any arrears owed to U.S. Bank by having U.S. Bank withhold those funds from the CA Fair Plan insurance proceeds.

This class is impaired and is entitled to vote on the Plan.

**Class 2: Carrington Mortgage Services, Holder of Second Trust Deed**

Carrington Mortgage Services is the lienholder on the Property by virtue of a second deed of trust recorded in Los Angeles County Recorder's Office on October 6, 2003.

The debt was incurred on August 12, 2003 when Debtors obtained a home equity line of credit for $100,000.00. On the petition date, Debtors owed approximately $71,988.93.

Debtors and Carrington sought to enter into a stipulation whereby Debtors would use the CA Fair Plan insurance proceeds to pay Carrington's claim in full. The stipulation was never finalized due to issues concerning who was entitled to receive funds from the insurance proceeds. Debtors will continue making monthly mortgage payments and cure any arrears. Upon the sale or refinance of the Property (as required by the stipulation with U.S. Bank), Debtors will pay the remaining balance owed to Carrington.

This claim is impaired and is entitled to vote on the Plan.

**C.    General Unsecured Claims (Class 3)**

General unsecured claims are unsecured claims not entitled to priority under Code Section 507(a). The only claim in this class is JT Legal Group, APC's $4,631.06 claim. The Plan's treatment of the class containing Debtors' one general unsecured claims is to be paid 100% without interest at a rate of 0% per annum upon confirmation of the Plan. Under § 1129(a)(15), if an unsecured creditor objects to confirmation, an individual debtor must either pay the present value of that unsecured claim in full or make distributions under the plan totaling at least the value of the debtor's net disposable income over the greater of (a) five years or (b)

the period for which the plan provides payments. However, § 1129(a)(15) should be read and applied in conjunction with § 1123(a)(4) which provides that a Chapter 11 plan must provide the same treatment for each claim in the same particular class.

**D.    Class(es) of Interest Holders.**

Interest holders are the parties who hold ownership interest (i.e., equity interest) in the Debtor. If the Debtor is a corporation, entities holding preferred or common stock in the Debtor are interest holders. If the Debtor is a partnership, the interest holders include both the general and limited partners. If the Debtor is an individual, the Debtor is the interest holder. The following chart identifies this Plan's treatment of the class of interest holders:

| Class # | Description | Impaired (Y/N) | Treatment |
|---------|-------------|----------------|-----------|
| 4 | Interest Holders | Y | The debtors will maintain their interests |

**E.    Executory Contracts and Unexpired Leases**

**1.    Executory Contracts and Leases Assumed.**

On the Effective Date, the Debtor assumes the executory contracts and unexpired leases enumerated in **Exhibit B** to the Disclosure Statement and shall perform all obligations thereunder, both preconfirmation and postconfirmation.

Any preconfirmation arrearages shall be paid by the Effective Date, unless the parties agree otherwise or the court finds that a proposed payment schedule provides timely cure and adequate assurance of future performance. Postconfirmation obligations will be paid as they come due.

**2.    Executory Contracts and Leases Rejected.**

The Debtor is conclusively deemed to have rejected all executory contracts and/or unexpired leases not previously assumed or listed in **Exhibit B** to the Disclosure Statement as of the Effective Date. Claims arising from the rejection of an executory contract or unexpired lease under this section are general unsecured claims in Class 3, except to the extent this court orders otherwise. A proof of claim arising from the rejection of an executory contract or unexpired lease

under this section must be filed no later than 30 days after the date of the order confirming this Plan.

## ARTICLE III

## ALLOWANCE AND DISALLOWANCE OF CLAIMS

**A.    Disputed Claim.**

A disputed claim is a claim that has not been allowed or disallowed and as to which either: (i) a proof of claim has been filed or deemed filed and the Debtor or another party in interest has filed an objection; or (ii) no proof of claim has been filed and the Debtor has scheduled such claim as disputed, contingent, unliquidated or unknown.

Claim No. 1 through Claim No. 4 by American Express totaling $41874.08. Debtors filed an objection to these claims on July 11, 2018. The objection was sustained and the claims were avoided.

**B.    Delayed Distribution on Disputed Claims.**

No distribution will be made on account of that portion of a claim that is disputed unless it is allowed by final nonappealable order.

**C.    Settlement of Disputed Claims.**

The Debtor will have the power and authority to settle and compromise a disputed claim with court approval and compliance with FRBP 9019 unless the amount allowed by the compromise does not exceed $500.00, in which case no court approval is necessary.

## ARTICLE IV

## MEANS OF IMPLEMENTATION

**A.    Funding for the Plan:**

**1.    Available Cash.** Debtor projects $818,037.03 cash will be available on the Effective Date.

**2.    Sale of Assets.**

Debtor projects no income from sale of assets.

**3.     Future disposable income.**

Debtor estimates that projected monthly disposable income available to creditors for the period following confirmation until the sale or refinance of the Property will be $668.16. This is based on the monthly income of $14,280.81 and expenses of $13,612.65 as set forth in Debtors' Declarations of Current/Postpetition Income and Expenses which have been prepared as of the date of the Disclosure Statement and are attached as **Exhibit A** to the Disclosure Statement.

This projection is consistent with (i) Debtor's average monthly income for the six months prior to this case of $6317.82, as set forth in Debtor's Statement of Current Monthly Income (Official Bankruptcy Form 22B) filed with this court and (ii) average monthly income of $14,280.81 and average monthly expenses (excluding professional expenses and fees incurred in this bankruptcy case) of $13,612.65 during the months since the petition date (based on monthly operating statements filed with the court), and such differences as are explained as follows:

Debtor has elected to surrender one rental property thereby reducing the total income and the property's respective expenses.

Upon written request, Debtor will provide copies of the Statement of Current Monthly Income and/or monthly operating statements.

**4.     Other Sources of Funding**

There are no other sources of funding.

**B.     Post-Confirmation Management**

The Debtors will continue to manage their own affairs.

**C.     Disbursing Agent**

The Debtors shall act as the disbursing agents for the purpose of making all distributions provided for under the Plan. The Disbursing Agents shall serve without bond and shall receive no compensation for distribution services rendered and expenses incurred pursuant to the Plan.

**D.     Distributions**

Cash payments made pursuant to the Plan shall be in U.S. dollars by checks drawn on a domestic bank selected by the disbursing agent.

---

INDVIDUAL DEBTORS' CHAPTER 11 PLAN OF REORGANIZATION

**E.**     **Unclaimed Distributions**

Any distributions under the Plan that unclaimed, undeliverable, rejected, or returned without explanation for a period of three months after distribution shall be distributed on a pro-rata basis to the Debtors' remaining unsecured creditors. If there are no remaining unsecured creditors, then the distribution will be paid to Classes 1 and 2 on a pro rata basis. If Classes 1 and 2 are paid in full, then the distribution shall be revested in the Reorganized Debtor, free of any restrictions, and any entitlement of any holder of any claim to such distribution or future distributions shall be extinguished and forever barred.

## **ARTICLE V**

### **DISCHARGE AND OTHER EFFECTS OF CONFIRMATION**

**A.**     **Discharge.**

Upon completion of all payments under the Plan, the Debtor shall receive a discharge of all preconfirmation debts, whether or not the creditor files a proof of claim, or accepts the Plan, unless the court orders otherwise. Such discharge will not discharge Debtor from any debts that are nondischargeable under § 523 or the obligations created by this Plan.

**B.**     **Revesting of Property in the Debtor.**

On the Effective Date, all property of the estate will vest in the reorganized debtor pursuant to § 1141(b), free and clear of all claims and interests except as provided in the Plan.

**C.**     **Plan Creates New Obligations.**

Except as otherwise stated in the Plan, the payments promised in the Plan constitute new contractual obligations that replace those obligations to creditors that existed prior to the Effective Date.

**D.**     **Creditor Action.**

Every creditor is entitled to pursue applicable state and federal law remedies—including judicial and non-judicial foreclosure and breach of contract actions—should Debtor default on its obligations under the Plan.

**E.**     **Retention of Jurisdiction.**

---

INDVIDUAL DEBTORS' CHAPTER 11 PLAN OF REORGANIZATION

1    The Court will retain jurisdiction to the extent provided by law.

2  **F.    Post-Confirmation Status Report.**

3    Within 120 days of the entry of the order confirming the Plan, Plan Proponent shall file a

4  status report with the Court explaining what progress has been made toward consummation of

5  the confirmed Plan. The status report shall be served on the United States Trustee, the twenty

6  largest unsecured creditors, and those parties who have requested special notice. Further status

7  reports shall be filed every 180 days and served on the same entities.

8  **G.    Quarterly Fees**

9    Quarterly fees accruing under 28 U.S.C. § 1930(a)(6) to date of confirmation shall be

10  paid to the United States Trustee on or before the effective date of the plan.  Quarterly fees

11  accruing under 28 U.S.C. § 1930(a)(6) after confirmation shall be paid to the United States

12  Trustee in accordance with 28 U.S.C. § 1930(a)(6) until entry of a final decree, or entry of an

13  order of dismissal or conversion to chapter 7.

14  **H.    Post-Confirmation Conversion/Dismissal**

15    A creditor or party in interest may bring a motion to convert or dismiss the case under §

16  1112(b), after the Plan is confirmed, if there is a default in performing the Plan.  If the Court

17  orders, the case converted to Chapter 7 after the Plan is confirmed, then all property that had

18  been property of the Chapter 11 estate, and that has not been disbursed pursuant to the Plan, will

19  revest in the Chapter 7 estate. The automatic stay will be reimposed upon the revested property,

20  but only to the extent that relief from stay was not previously authorized by the Court during this

21  case.

22    The order confirming the Plan may also be revoked under very limited circumstances.

23  The Court may revoke the order if the order of confirmation was procured by fraud and if the

24  party in interest brings an adversary proceeding to revoke confirmation within 180 days after the

25  entry of the order of confirmation.

26  **I.    Final Decree.**

27

28

---

INDVIDUAL DEBTORS' CHAPTER 11 PLAN OF REORGANIZATION

Once the estate has been fully administered as referred to in Bankruptcy Rule 3022, the Plan Proponent, or other party as the Court shall designate in the Plan Confirmation Order, shall file a motion with the Court to obtain a final decree to close the case.

## ARTICLE VI:

## GENERAL PROVISIONS

**A.**   **Definitions and Rules of Construction.**

The definitions and rules of construction set forth in §§ 101 and 102 of the Bankruptcy Code shall apply when terms defined or construed in the Bankruptcy Code are used in the Plan.

**B.**   **Effective Date of Plan.**

The Effective Date of the Plan is 14 days following the date of the entry of the order confirming the Plan. But, if a stay of the confirmation order is in effect on that date, the Effective Date will be the first business day after the date on which no stay of the confirmation order is in effect, provided that the confirmation order has not been vacated.

**C.**   **Cramdown.**

Debtor reserves the right to seek confirmation of the Plan notwithstanding the rejection of the Plan by one or more classes of creditors, pursuant to § 1129(b).

**D.**   **Binding Effect.**

The rights and obligations of any entity named or referred to in this Plan will be binding upon and will inure to the benefit of the successors or assigns of such entity.

**E.**   **Captions.**

The headings contained in this Plan are for convenience of reference only and do not affect the meaning or interpretation of the Plan.

**F.**   **Controlling Effect.**

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code or FRBP), the laws of the State of California govern the Plan and any agreements, documents and instruments executed in connection with the Plan, except as otherwise provided in this Plan.

---

1  DATED: 12-13-19

2  Respectfully submitted:

3

4  _____
   Ronald Palmer, Debtor and Plan Proponent

5

6  _____
   Lola Palmer, Debtor and Plan Proponent

7

8  DATED:

9  ROUNDS & SUTTER, LLP

10

11 By: _____
      John K. Rounds, Attorney for Debtors and Plan

12    Proponents Ronald and Lola Palmer

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

INDIVIDUAL DEBTORS' CHAPTER 11 PLAN OF REORGANIZATION

# EXHIBIT "A"

## DECLARATION OF RONALD FRANCE AND LOLA MARIE PALMER

We, Ronald France and Lola Marie Palmer, declare as follows:

1.      We are the named Debtors in the bankruptcy proceeding.

2.      We make this declaration of our own personal knowledge and would so testify.

3.      We are the owners of the real property commonly known as 5269 Horizon Drive, Malibu, CA 90265 ("Property") whereby U.S. Bank Trust National Association as Trustee of Chalet Series III Trust ("U.S. Bank") holds a promissory note secured by a first deed of trust and Carrington Mortgage Services ("Carrington") holds a promissory note secured by a second deed of trust.

4.      On November 9, 2018, we lost our home to the Woolsey Fire. Despite the fact that our home burned down during the fire, the fair market value of the Property is approximately $2,000,000.00.

5.      As most of our personal property was lost in the Woolsey Fire, the fair market value of our personal property is approximately $1,900.00.

6.      We are both senior citizens and continue to work in Ronald's CPA business on the few remaining accounts we maintain. Currently, we are attempting to rebuild our home of 40 years and residing in a trailer located on the Property during the rebuild process.

7.      We receive approximately $2,995.00 a month in social security. Ronald also receives approximately $2,758.65 a month from interest and dividends and approximately $564.17 from his pension and retirement fund. Since the Woolsey Fire and the loss of our Property and personal property, we have also received proceeds from our insurance companies.

8.      We acquired the first and second deeds of trust to fund some real estate investments in and around the Palm Springs, CA area. Due to some construction delays and the fall in the real estate market, we lost our investment and fell behind on the mortgage for U.S. Bank. We remained current on the Carrington mortgage payments.

9.      As a result of the above, in January 2011, August 2017, and November 2017, we filed voluntary Chapter 13 Bankruptcy Cases in the Central District of California. All cases were dismissed for failure to timely file the remainder of the necessary documents.

1    10.    On June 4, 2018 we filed this voluntary Chapter 11 Bankruptcy Case in the

2    Central District of California.

3    11.    Since the filing of our Bankruptcy Case, and the above-mentioned increase in

4    monthly income, we estimate our projected monthly disposable income available to creditors to

5    be approximately $668.16. This is based on our average monthly net income of approximately

6    $143,280.81 and expenses of approximately $13,612.65. The 90 Day Expense Sheet that is

7    attached as Exhibit D is based on our income and expenses since June 2018.

8    12.    In addition, upon completing the rebuild of our home and refinancing or selling

9    our home pursuant to the terms of the stipulation with U.S. Bank, we will have enough funds to

10   pay U.S. Bank and Carrington in full. Upon confirmation of our Chapter 11 Plan we will pay in

11   full and our one unsecured creditor, JT Legal Group, APC.

12

13   Executed on the _13_ day of ~~November~~ December, 2019 at Malibu, California.

14

15

16

17   RONALD FRANCES PALMER

18

19

20   LOLA MARIE PALMER

21

22

23

24

25

26

27

28

# EXHIBIT "B"

**PODS**
4450 Edison Ave
Chino, CA 91710

14093 Balboa Blvd, Unit B
Sylmar, CA 91342

220 East Stanley St.
Rancho Dominguez, CA 90220

1-800-776-PODS (7637)
FAX: 727-532-2650
PODS.com

THIS RENTAL AGREEMENT ("Agreement") sets forth the terms and conditions upon which PODS Enterprises, LLC, a Florida limited liability company ("Company") will provide services to the party(ies) whose name(s) is set forth in the signature block below or is otherwise referenced in the order confirmation (the "Confirmation") issued by the Company to the party(ies) ("Customer"). Customer accepts this Agreement when Customer does any of the following: (a) provides a written or electronic signature; (b) attempts to or in any way uses the services of Company; (c) loads or stores goods in a Unit (defined below); or (d) pays for any services of Company. This Agreement shall apply to all present and future services provided by Company to Customer and all present and future orders made by Customer, including, but not limited to, the rental and leasing of a Unit. In consideration of the foregoing, the receipt and sufficiency of which is hereby acknowledged, and the mutual promises and assumption of obligations described in this Agreement, the parties hereto hereby agree as follows:

1. RENTAL. Customer has or will retain Company's services to rent one or more portable storage containers or units (individually or collectively referred to as a "Unit"). Customer has the option to store the Unit with Company or have the Unit remain at Customer's designated location ("Customer's Premises"). Should Customer elect to have Company store the Unit at Company's premises, Customer agrees that Company shall have the right and authority to store the Unit at either a storage facility of Company, Company's affiliate or Company's franchise ("Facility"). Company shall attempt to store the Unit at a Facility closest to Customer's address. By giving advance notice to Company, Customer shall have access to the Unit during Company's Facility only during specified hours when are normally 8:30 am to 5:00 pm local time. Customer should call the number above to confirm the access hours, schedule access or make special arrangements for access during non-business hours. Upon use of the Unit, Customer acknowledges having had an opportunity to examine the Unit and that such Unit is satisfactory for all purposes for which Customer shall use it. Customer hereby authorizes Company to enter upon the Customer's Premises whenever Company deems it necessary to enforce any of Company's rights pursuant to this Agreement or pursuant to any state or federal law. Customer warrants that Customer has an owner or otherwise: (a) all the necessary rights with respect to the Customer's Premises for purposes of this Agreement; and (b) the right and authority to permit Company's unrestricted entrance upon Customer's Premises. Customer acknowledges and agrees that no bailment or deposit of goods for safekeeping is intended or created hereunder. Due to the nature of Company's business and its purpose being self-service storage, Customer further understands that Company is not representing to Customer, in any manner whatsoever, that Company is a 'warehouseman' as such term is defined by applicable state statutes. Further, the parties expressly understand and agree that it is the parties' intention that any laws including, without limitation, warehousemen laws, or similar or related laws pertaining to the establishment or creation of a bailment relationship or any other relationship pertaining to the deposit of goods for safekeeping shall not apply to this Agreement.

2. TERM AND RENT. Company has issued or will issue a Confirmation of Customer's order that sets forth the agreed upon pricing of Company's delivery and storage services including other specifics of such order. Company will issue a change order confirmation for changes requested by Customer that are accepted by Company. The rental term for each Unit commences upon delivery and continues thereafter on a monthly basis until terminated as provided herein. Customer must pay the Company, in advance, monthly rent (the "Rent"), plus any applicable taxes, in the amount set forth on the Confirmation or Invoice, without deduction, prior notice, or demand. Rent for the first month and initial charges and fees shall be due prior to delivery of the Unit and Rent in subsequent months will be due on the monthly anniversary of the delivery or the last day of the month if the corresponding date does not exist in the subsequent month. Time is of the essence with respect to all payment obligations due under this Agreement. Customer will not be entitled to a refund of any prepaid rent under any circumstances. Company may change the monthly rent and other charges by giving Customer 30 days advance written notice. The new rate will become effective on the first day of the next month where charges are due. In the event that Customer's account has an outstanding balance, Customer understands and agrees that Company does not waive its lien rights on the property stored in the Unit if accepts partial payments to reduce the outstanding balance on Customer's account. Customer understands and agrees that full payment of the outstanding balance must be tendered prior to the sale date to stop a scheduled lien sale.

3. FEES, LATE CHARGES, ETC.
   (a) In the event Customer fails to pay Rent by the 10th day after becoming due or the earliest date permitted by applicable law, Customer shall pay, in addition to any other amounts due, a late charge equal to the lesser of $20.00 on each such occasion or the maximum amount allowed by applicable law for each delinquent payment each and every month that such payment(s) remain(s) delinquent plus Customer will be responsible for all of Company's costs of collection, including, but not limited to, court costs, filing fees and attorneys' fees.
   (b) In the event Company commences a lien sale as a result of Customer's default in the payment of Rent or other charges due under this Agreement, Customer shall pay, whether or not a lien sale occurs, all costs and expenses incurred by Company associated with processing the delinquent account, including advertising and mailing fees, plus a lien handling charge of up to $75.00.
   (c) In the event Customer is delinquent in the payment of Rent or other charges due under this Agreement, including without limitation, financing charges, late charges, handling charges and costs associated with the processing of Customer's delinquent account (collectively, "Charges"), Customer authorizes Company to charge Customer's credit card account, without the signature of Customer, for such Charges owed by Customer to Company, even if Customer has selected another method of payment as the preferred method. Company shall have no liability to Customer for charges applied to Customer's credit card account so long as such Charges are applied by Company in good faith.
   (d) Additional fees may be incurred for delivery, redelivery or extended delivery, in addition to any fee assessed against Company for any military DITY weight, as applicable.

4. LIMITS ON USE. Customer understands and agrees that Company need not be concerned with the kind, quantity or value of personal property or other goods stored by Customer in the Unit pursuant to this Agreement. Customer specifically acknowledges and agrees: (a) that the Unit may be used for storage only, and that the use of the Unit for the conduct of business or for HUMAN OR ANIMAL HABITATION IS SPECIFICALLY PROHIBITED; (b) that Customer assumes full responsibility and liability for packing Customer's property in the Unit and Customer's property for over the road transportation) and (c) the weight of Customer's property packed into the Unit shall be evenly distributed throughout the Unit. Customer shall store only personal property throughout the temporary that Customer owns or has the legal right and authority to store in the Unit. Customer shall not store any food or perishable, hazardous, illegal, stolen, environmentally harmful, explosive or flammable property. Customer shall not use the Unit in any manner that will constitute waste, nuisance or unreasonable annoyance to other customers at the Facility. Customer acknowledges and agrees that the Unit and the Facility are not suitable for the storage of objects which have sentimental value to the Customer or others, including, but not limited to, heirlooms or irreplaceable property such as works of art, collectibles and other items for which an immediate resale market exists. Customer agrees that the value of any of the foregoing items that Customer chooses to store in the Unit is violation of this provision shall be limited to the salvage value of the item's raw materials. Further, Customer acknowledges and agrees not to store the following items in the Unit: money, precious metals, jewelry, watches, furs, vehicles, motorcycles, engines, computer software or programs, media or computer data contained on hard disks or drives, and property not owned by the Customer or for which Customer is not legally liable. Unless Customer satisfies Customer's insurance requirements set forth below, Customer agrees not to store property in the Unit that has an aggregate value of over $5,000. Customer further agrees not to store property in the Unit that may cause consequential damages or emotional distress to Customer or others if it were missing, stolen, sold or damaged.

5. CUSTOMER'S RISK AND LIABILITY / INSURANCE OBLIGATION. Subject to Section 6, whether the Unit is located at the Customer's Premises, at the Facility or in transit, Customer expressly assumes all risk of loss or damage to or theft of Customer's property stored in the Unit however caused, including, without limitation, burglary, mysterious disappearance, fire, water, rodents, insects, vermin, bugs, earthquakes, acts of God, vandalism, mold, mildew, or the active or passive acts or omissions or negligence of Company or Company's Agents. Customer specifically acknowledges that Company shall not be liable for any damage to or loss of Customer's property for any reason unless specifically assumed through the CP Addendum (defined below). It is Customer's responsibility to adequately insure the property stored by Customer. Customer agrees to insure the actual full value of the stored property against loss and damage.

6. CONTENTS PROTECTION. Notwithstanding Section 5, in lieu of obtaining insurance, Customer may choose to have Company contractually (a) assume responsibility for specified loss (subject to applicable exclusions) resulting from certain named perils (such as fire, wind, hail, smoke, collapse of building, burglary, etc.) ("Named Perils"), and (b) obtain insurance protecting Customer's contents from such loss with an insurance company rated no less than "A" (excellent) by A.M. Best Co (the "Contents Protection"). The terms and conditions of Contents Protection are set forth in the Contents Protection/Duty to Insure Addendum, which can be found at www.pods.com/CPO (the "CP Addendum"). Such terms and conditions establish and clarify the contractual liabilities of each party if Customer orders Contents Protection from Company and makes all additional payments therefore. Customer may choose to obtain supplemental insurance from their own homeowner's or renter's carrier or Customer may elect to be "self insured." If Customer elects to have Contents Protection, (i) Company's role is expanded to a modicum of goods for safekeeping in its possession or care and control, but only to the extent of being contractually responsible for specified loss and obtaining insurance protecting Customer's contents from such loss, and only to the extent such insurance is collectible; (ii) Customer shall be a loss payee and third party beneficiary to all proceeds recoverable under the insurance policy; (iii) Company's obligation to assume the risk of loss under the Contents Protection resulting form Named Perils shall not exceed the limit of coverage secured by Customer under the CP Addendum; and (iv) Container Only Option Protection shall apply, which is father described below. Although Company and Company's Agents may share information about the insurance policy purchased by the Company with Customer, Customer understands that Company and Company's Agents are not an insurance company or insurance agents. Company has not explained any coverage or assisted Customer in making any decision to purchase any particular insurance policy. Company is not making any representations about the coverage provided by such insurance policy. Company's agreement to assume responsibility for and obtain insurance protecting Customer's contents from loss is not an insurance transaction.

7. LIMITATION OF LIABILITY. Subject to Section 6, Company and Company's Agents shall not be responsible to Customer or to any other person for any damage or loss however caused, including, without limitation, Company and Company's Agents active or passive acts, omissions, negligence or conversion, unless the loss or damage is directly caused by Company's Willful injury or willful violation of law. In addition, Customer hereby releases Company and Company's Agents from any responsibility for any loss, liability, claim, expense, damage to property or injury to persons that could have been insured against. Customer expressly agrees that the carrier of any insurance obtained by Customer shall not be subrogated to any claim of Customer against Company or Company's Agents. CUSTOMER WAIVES ANY CLAIM FOR EMOTIONAL OR FOR SENTIMENTAL ATTACHMENT TO CUSTOMER'S PROPERTY. TO THE MAXIMUM EXTENT ALLOWED BY APPLICABLE LAW, CUSTOMER WAIVES ALL CLAIMS FOR CONSEQUENTIAL, SPECIAL, PUNITIVE AND INCIDENTAL DAMAGES THAT MIGHT OTHERWISE BE AVAILABLE TO CUSTOMER. OTHER THAN THE LIABILITY SPECIFICALLY ASSUMED THROUGH THE CP ADDENDUM, COMPANY'S AND COMPANY'S AGENT'S TOTAL, CUMULATIVE LIABILITY ARISING OUT OF OR RELATED TO THE AGREEMENT FOR ANY REASON, INCLUDING FROM DAMAGE TO OR LOSS OF CUSTOMER'S PROPERTY, SHALL NOT EXCEED $5,000. THE EXISTENCE OF MORE THAN ONE CLAIM SHALL NOT ENLARGE THIS LIMIT.

8. INDEMNITY. Customer shall indemnify, defend and hold harmless Company, its affiliates and agents, and each of their respective directors, officers, members, employees, agents and representatives (collectively, "Company's Agents") from and against any and all losses, liabilities, costs, expenses, attorneys' fees, fines, damages, claims, demands, causes of action and lawsuits of any kind whatsoever in any way arising from, or as a result of, or in connection with, Customer's use of the Unit or Facility, including, without limitation, as a result of any of Customer's breach of Customer's obligations pursuant to this Agreement.

9. LOCK; ALTERATIONS. Customer shall provide, at Customer's own expense, a bolt for the Unit which Customer, in Customer's sole discretion, deems sufficient to secure the Unit. Customer shall not provide Company or Company's Agents with a key and/or combination to Customer's lock. The Unit must be properly locked by Customer prior to Company moving the Unit. Customer shall not make or allow any alterations of any kind or description whatsoever to the Unit without, in each instance, the prior written consent of the Company.

10. LIEN. Customer's property will be subject to a claim of lien and may even be sold to satisfy the lien if the rent or other charges due remain unpaid for 14 consecutive days and that such actions are authorized by the California Self-Service Storage Facility Act as set forth in Division 8, Chapter 10 of the California Business & Professions Code. IN ADDITION TO ANY LIENS AND REMEDIES PROVIDED BY APPLICABLE STATE LAW TO SECURE AND COLLECT RENT, CUSTOMER HEREBY GRANTS TO COMPANY A CONTRACTUAL LIEN UPON ALL PROPERTY, NOW OR AT ANY TIME HEREAFTER STORED IN THE UNIT OR AT THE FACILITY, TO SECURE THE PAYMENT OF ALL RENTS OR OTHER CHARGES PAYABLE UNDER THIS AGREEMENT, IN THE EVENT CUSTOMER IS IN DEFAULT OF THIS AGREEMENT, COMPANY MAY DENY ACCESS TO THE UNIT AND BEGIN THE ENFORCEMENT OF ITS LIEN AGAINST ALL PROPERTY OF CUSTOMER STORED IN THE UNIT OR AT THE FACILITY IN ACCORDANCE WITH THE LAWS OF THE JURISDICTION IN WHICH THE CUSTOMER'S PROPERTY IS LOCATED WHEN COMPANY COMMENCES THE ENFORCEMENT OF ITS LIEN. PROPERTY MAY BE SOLD OR OTHERWISE DISPOSED OF AT THE FACILITY OR NEAREST SUITABLE LOCATION TO SATISFY THE APPLICABLE LIEN LAW. PROCEEDS, IF ANY, FROM THE SALE OF THE PROPERTY IN EXCESS OF AMOUNTS OWED TO COMPANY, WILL BE PAID (IF ANY) TO THE STATE TREASURER IF CUSTOMER IS UNCLAIMED THAT CUSTOMER AS PRESCRIBED BY APPLICABLE LAW. AS COMPANY HAS NO KNOWLEDGE OF THE CONTENTS STORED IN THE UNIT, CUSTOMER HEREBY WAIVES ANY OBLIGATION THAT COMPANY PROVIDE A DESCRIPTION OF THE PERSONAL PROPERTY IN CUSTOMER'S UNIT TO THE EXTENT REQUIRED BY APPLICABLE STATE LIEN LAWS.
IN ACCORDANCE WITH APPLICABLE LIEN LAWS, PLEASE PROVIDE HERE THE NAME AND ADDRESS OF ANOTHER PERSON TO WHOM NOTICES OF LIEN MAY BE SENT:

_____

IF CUSTOMER ACCEPTED THIS AGREEMENT ONLINE, ANY ALTERNATE CONTACT INFORMATION PROVIDED ONLINE IS INCORPORATED HEREIN BY REFERENCE. IF NO ALTERNATE CONTACT INFORMATION IS PROVIDED AND NONE IS PROVIDED ABOVE, PLEASE CONTACT COMPANY TO PROVIDE SUCH INFORMATION.

11. WAIVER. Customer acknowledges that the California Self-Service Storage Facility Act requires Company to disclose to Customer, at least 72 hours prior to delivery to Customer of an empty Unit, this Agreement and the terms and conditions set forth in Section 21707.1(a)(6) of California's Business and Professions Code. Customer acknowledges that Company provided Customer a document with such terms and conditions and that Customer fully understands and voluntarily waives Company's requirement to provide Customer with this Agreement and such terms and conditions at least 72 hours prior to the delivery to Customer of an empty Unit.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement, and agree to be bound by all the provisions of this Agreement including the provisions contained below or on the reverse side of this page.

By COMPANY: PODS ENTERPRISES, LLC        CUSTOMER:        Name: _____        Date: _____

Signature: _____

PAGE 1 of 2        © PODS ENTERPRISES, LLC. All rights reserved.        REV 1/16

12. **PERSONAL INJURY.** Company and Company's Agents including the owner of the Facility shall not be liable whatsoever to the Customer or Customer's invitees, family, employees or agents for any personal injury arising from Customer's use of the Unit or the Facility from any cause whatsoever including, but not limited to, the active or passive acts or omission or negligence of the Company, Company's Agents or the owner of the Facility.

13. **NO REPRESENTATIONS OR WARRANTIES.** Company hereby disclaims any implied or express warranties, guarantees, representations of the nature, condition, safety or security of the Unit and the Facility, *including any warranties of merchantability or fitness for a particular use or purpose.* Customer hereby acknowledges and agrees that Company does not represent or guarantee the safety or security of the Unit or the Facility or of any property stored therein and this Agreement does not create any contractual duty for Company to create or maintain such safety or security. Customer further acknowledges and understands that Company makes no assurances or guarantees regarding the time of pickup or delivery of any Unit. Company does not make any representations or warranties that any Fuel Subsidy Charge (if applicable) or any other similar charge charged to Customer equals its excess fuel costs or that it will not profit from such charge.

14. **ACCESS CODE (PIN).** At time of order Customer will be asked to provide a four (4) digit number which will be used as Customer's "PIN". Company will require the PIN before providing access to the Unit and/or before scheduling a move or delivery of the Unit. Customer acknowledges and agrees that Company has the right to provide access to the Customer's account (which may permit changing information, including the PIN) and the Unit to anyone providing Company with the PIN, and that Company has the right to refuse access to the Unit by anyone, including Customer, who does not have the PIN. Customer should only disclose the PIN to those persons who Customer wants to have unrestricted access to the account and the Unit.

15. **WEIGHT LIMITS.** Customer acknowledges and agrees that the maximum weight of Customer's property shall not exceed 4,200 pounds contained in the Company's sixteen-foot (16') Unit, 4,700 pounds in the Company's twelve-foot (12') Unit, and 5,200 pounds contained in the seven-foot (7') Unit. The foregoing weight limits do not apply to a Customer that does not require the transport of Customer's Unit at any time by Company with Customer's contents stored inside. The foregoing weight limits may be updated by Company from time to time.

16. **PLACEMENT OF UNIT.** Customer acknowledges that Company will attempt to place the Unit on a driveway or other paved surface immediately accessible from a street fronting Customer's Premises and represents such placement area shall have adequate size, clearance (at least 15' in height), and structural integrity to sustain the weight and size of the Unit, delivery truck and any other related equipment. Customer authorizes Company to: (a) drive on Customer's lawn, non-paved area or any other area in order to place or retrieve the Unit pursuant to Customer's instructions or due to a designated area lacking adequate size and/or clearance, or (b) drive on a paved surface. In either case above, Customer assumes full risk for all damage resulting from the delivery, placement and retrieval of the Unit and Customer releases Company from any responsibility for such damage. Any deliveries or retrievals of the Unit requiring Company to access the Unit by way of non-paved areas shall permit Company, at its option, to assess Customer a service charge, which Customer agrees to pay. Customer agrees that Customer will not relocate the Unit. In the event it is determined that the Unit has been relocated, Customer agrees to pay an additional fee of not less than $75.00 and up to current retail value of the Unit plus any cost or shipping associated with the retrieval of the Unit. There shall be no rent or delivery fee refunds for Company's inability to deliver the Unit through no fault of Company.

17. **RIGHT TO ENTER, INSPECT AND REPAIR UNIT.** Customer grants Company, Company's Agents or the representatives of any governmental authority, including police and fire officials, access to the Unit and the premises where such Unit may be located, if necessary, as required by applicable laws and regulations or in connection with Company exercising its rights as set forth in this section. In the event Customer shall not grant access to the Unit as required, or in the event of an emergency or upon default of any of Customer's obligations under this Agreement, Company, Company's Agents or the representatives of any governmental authority shall have the right, but not the obligation, to remove Customer's locks and enter the Unit for the purpose of examining the Unit or the contents thereof or for the purpose of making repairs or alterations to the Unit and taking such other action as may be necessary or appropriate to preserve the Unit, or to comply with applicable law including any applicable local, state or federal law or regulation governing hazardous materials or to enforce any of Company's rights.

18. **TERMINATION.** Company may terminate this Agreement for any or no reason effective immediately upon written notice to Customer. Customer may terminate this Agreement at any time giving notice to Company and such termination shall be effective as of the last day of the rental month. Notwithstanding the foregoing, Customer shall only be entitled to terminate this Agreement provided there are no outstanding amounts owing to Company and Customer is not in default under this Agreement. Notwithstanding any provision to the contrary in this Agreement, no monthly rent shall be prorated or refunded if the termination occurs prior to the end of a full rental month.

19. **DEFAULT.** The following events shall be deemed to be events of default by Customer under this Agreement: (a) Customer fails to pay any installment of the rent due under this Agreement; (b) Customer fails to comply with any term, provision or covenant of this Agreement, other than the payment of rent, and does not cure such failure within ten (10) days after written notice thereof to Customer; or (c) Customer abandons the Unit.

20. **REMEDIES UPON EVENT OF DEFAULT.** If an event of default shall occur and so long as such default shall be continuing, Company may at any time thereafter at its election: (i) deny Customer access to Customer's property stored in the Unit, (ii) immediately terminate this Agreement by giving notice to Customer, (iii) enter upon Customer's Premises and take possession of the Unit and Customer's property stored in the Unit, (iv) expel or remove Customer from the Unit, without being liable for prosecution or any claim of damages, (v) CHARGE CUSTOMER ALL EXPENSES (INCLUDING REASONABLE ATTORNEYS' FEES) INCURRED BY COMPANY THAT ARE CONNECTED WITH THE COLLECTION OF ANY AND ALL OUTSTANDING BALANCES OWED BY CUSTOMER, and/or (vi) pursue any other remedies provided for under this Agreement or at law or in equity. In the event that Company repossesses the Unit, Customer hereby waives claims for trespass and/or conversion and agrees that Customer shall not hold Company liable for any damage or loss to Customer's property or Customer's Premises arising from said repossession. Company's remedies, including its lien rights, are cumulative and any or all thereof may be exercised instead of or in addition to each other or any other remedies available to Company at law or in equity.

21. **CONDITION OF UNIT UPON TERMINATION; DAMAGE WAIVER.** Upon termination of this Agreement for any reason, Customer shall remove all Customer's personal property from the Unit, unless such property is subject to Company's lien rights pursuant to this Agreement, and shall immediately deliver possession of the Unit to Company in the same condition as delivered to Customer, reasonable wear and tear excepted. *Customer agrees that any personal property left in the Unit shall be deemed abandoned by Customer, and with respect thereto, Customer authorizes Company to remove such property from the Unit and either dispose of it in any manner in Company's sole discretion and without liability to Customer or retain such property as collateral for payment of the removal charges and/or any other amounts due Company. Nothing herein shall be construed as imposing a duty upon Company to store or safeguard the Customer's property. Customer shall be responsible for any reasonable charges associated with cleaning-up of the Unit and disposal of such property by Company.* While the Unit is not in Company's possession, Customer accepts all responsibility for theft of or damage to the Unit regardless of Customer's fault or negligence, the fault or negligence, other person or acts of God (e.g., fire, rain, wind, etc.), and shall reimburse Company for all expenses reasonably incurred by Company to replace or restore the Unit that shall be paid by the Customer as additional rent. Company offers optional Unit damage waiver ("Container Only Option Protection" or "COO") that Customer may purchase from Company. If Customer purchases COO, Company agrees to contractually waive Customer's responsibility for all of the cost of damage however caused to the Unit regardless of fault or possession of the Unit, except that COO shall be invalidated if (a) the Unit is (i) deliberately damaged by Customer, (ii) damaged due to Customer's gross negligence, or (iii) damaged as a direct result of an act of Customer prohibited by the terms of this Agreement or due to the storage of an item(s) prohibited by the terms of this Agreement, (b) Customer fails to make payments for COO, or (c) Customer fails or refuses to provide Company, the police or other authorities with a full report of any accident or vandalism involving the Unit or otherwise fails to cooperate with Company, the police or other authorities in the investigation of any accident or vandalism. The Container Only Option Protection applies only to the Unit and is not protection for the contents stored in the Unit.

22. **RELEASE OF INFORMATION.** Customer hereby authorizes Company to release any information regarding Customer and Customer's tenancy as may be permitted by Company's privacy policy or as may be required by law or requested by governmental authorities or agencies, law enforcement agencies or courts including, but not limited to, officials from local and state code enforcement agencies.

23. **NOTICES.** Except as otherwise expressly provided in this Agreement, any written notices or demands required or permitted to be given under the terms of this Agreement may be personally served or may be served by first class mail or certified mail, deposited in the United States mail with postage thereon fully prepaid and addressed to the party to be served at such party provided for in this Agreement. Service of any such notice or demand shall be deemed complete on the date delivered, if personally delivered, or if mailed, shall be deemed delivered after deposit in the United States mail, with postage thereon fully prepaid and sent to the last known address of the intended recipient as provided for in this Agreement. In addition, Company may communicate with Customer and provide Customer with any written notices required by applicable law or authorized under this Agreement via electronic mail if Customer has provided the Company with an electronic address.

24. **NOTIFICATION OF CHANGE OF ADDRESS.** In the event Customer shall change Customer's place of residence or alternate address, Customer shall give Company written notice of any such change within ten (10) days of the change, specifying Customer's current residence, alternate address and telephone numbers. Failure to provide forwarding information in writing releases Company of any damages that might occur in the event that the Unit must be removed or in exercising Company's remedies upon an event of default. Company assumes no responsibility and will make no attempts to locate Customer if such information has not been provided.

25. **GOVERNING LAW; JURISDICTION; WAIVER OF JURY TRIAL.** This Agreement shall be governed and construed in accordance with the laws of the State of California. Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under California law, but, if any provision of this Agreement shall be invalid or prohibited under California law, such provision shall be ineffective only to the extent of such prohibition or invalidity without invalidating the remainder of such provision or the remaining provisions of this Agreement. Customer agrees to waive their rights to a jury trial for any and all claims made against or through Company. Customer further agrees that Company will be notified of all claims no later than the earlier of sixty (60) days from the initial discovery of the claim or default or sixty (60) days following the expiration or termination of this Agreement and failure to do so will result in the forfeiture of said claim. Any claims by Customer arising under this Agreement must be brought in a court of competent jurisdiction located in geographic area in which Company has its original place of business at the time of commencement of litigation proceedings. Customer waives any objection to the jurisdiction and venue of such courts. This exclusive choice of jurisdiction does not preclude Customer or Company from bringing an action to enforce any judgment or judicial order in any other jurisdiction. The prevailing party in any dispute will be entitled to recover from the losing party its costs (including costs of collection, reasonable attorneys' fees, and investigative fees).

26. **ASSIGNMENT; SUCCESSION; THIRD PARTY BENEFICIARIES.** Customer shall not assign or sublease the Unit or any portion thereof without in each instance the prior written consent of Company. Company may assign or transfer this Agreement without the consent of Customer and, after such assignment or transfer, Company shall be released from all obligations under this Agreement occurring after such assignment or transfer. All of the provisions of this Agreement shall apply to, bind and be obligatory upon the heirs, executors, administrators, representatives, successors and assigns of the parties hereto. This Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer on any other person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement. Notwithstanding the foregoing, any Company Agent is a third party beneficiary of this Agreement, and has the right to enforce the provisions of this Agreement directly against the Customer.

27. **RULES AND REGULATIONS.** The rules and regulations (the "Regulations") of Company's Facilities posted in a conspicuous place at the Facility are made a part of this Agreement and Customer shall comply at all times with such Regulations while at the Facility. Company shall have the right from time to time to promulgate amendments and additional rules and regulations for the safety, care and cleanliness of the Unit, Facility and all common areas of the Facility, or for the preservation of good order and, upon the posting of any such amendments or additions in a conspicuous place at the Facility, they shall become a part of this Agreement.

28. **LOCAL ORDINANCES AND REGULATIONS.** Customer acknowledges that Customer's use and placement of the Unit may be subject to county, city and local ordinances, rules and/or regulations including deed and homeowner restrictions and complex rules. *Customer assumes full responsibility for identifying and complying with local ordinances and for any fines and/or penalties, monetary or otherwise, resulting from Customer's use or placement of the Unit in violation of such ordinances, rules and/or regulations.* If an authority requires Company to remove the Unit from Customer's premises, Company will attempt to notify Customer of such requirement, provided, however, Customer gives Company full authority to comply with such requirements, and absolves Company of any liability for any resulting damage to Customer's premises or property. Additionally, if Customer is renting or leasing the premises where the Unit is located, other than property owned by Company, and the landlord of the premises requests that the Unit be removed or relocated, Customer gives Company full authority to comply with the landlord's request, and absolves Company of any liability for any resulting damage to Customer's property or the premises and shall indemnify and hold harmless Company from any claims by the landlord for damage to the premises. Customer further understands that should the Unit be removed by any person other than Company, Customer assumes all costs, including, but not limited to, legal fees, and any removal or storage fees that are incurred with the Unit's retrieval and further agrees to pay Company for any damages that are associated with such removal and storage of the Unit.

29. **FORCE MAJEURE.** Company shall not be held liable for any delay, interruption, or failure to perform any of its obligations under this agreement, and shall be excused from any further performance, due to circumstances beyond its reasonable control, which circumstances shall include, but not be limited to, any act of God, any act of any governmental authority, insurrection, riots, national emergencies, war, acts of public enemies, terrorism, inability to secure adequate labor or material, strikes, lock-outs or other labor difficulties, failure or delay of transportation, fires, floods, storms, explosions, severe weather conditions, earthquakes, or other catastrophes or serious accidents, epidemics or embargoes.

30. **MISCELLANEOUS.** Customer understands and agrees that telephonic communications with Company or its Agents may be recorded under the business exception of Florida statute Chapter 934 and Texas Penal Code 16.02. By providing your cellular number, Customer agrees to permit Company or its agents to contact Customer using an automatic telephone dialing system and/or a prerecorded voice regarding matters relevant to Customer's account, including, without limitation, estimated time of arrivals and pickups of containers, status of Customer's contract, accounts payable, and any other operational or account matters. Company may make changes to the terms and conditions of this Agreement from time to time by either mailing the updated agreement available through Customer's online account or by mailing the updated agreement to Customer's last known address. Company may make such changes, at Company's option, without providing any special notice or upon 30 days prior written notice to Customer. This Agreement, including all other documents specifically referenced in this Agreement, sets forth the entire agreement of the parties with respect to the subject matter hereof and supersedes all prior agreements or understandings with respect thereto. There are no representations, warranties, or agreements by or between the parties, which are not fully set forth herein, and no representative of Company or Company's Agents is authorized to make any representations, warranties or agreements other than as expressly set forth herein.

# EXHIBIT "C"

**Chapter 11 Case No:  9:18-bk-10894-DS**
**Debtors: Ronald and Lola Palmer**

## Projected 90-Day Cash Flow

| | MONTH 1 | MONTH 2 | MONTH 3 |
|---|---|---|---|
| **INCOME** | | | |
| Income from Rental Property | $2,785.65 | $2,785.65 | $2,785.65 |
| Social Security | $2,995.00 | $2,995.00 | $2,995.00 |
| Pension Income | $564.17 | $564.17 | $564.17 |
| Insurance Proceeds | $272,679.01 | $272,679.01 | $272,679.01 |
| Net Income (see attached) | $279,023.82 | $279,023.82 | $279,023.82 |
| | | | |
| **EXPENSES** | | | |
| Mortgage (First) | $6,070.99 | $6,070.99 | $6,070.99 |
| Electric/Heat/Gas | $140.00 | $140.00 | $140.00 |
| Water/Sewage | $132.00 | $132.00 | $132.00 |
| Phone | | | |
| Life Insurance | | | |
| Car Insurance | $79.42 | $79.42 | $79.42 |
| Home Maintenance | | | |
| Tenant Insurance | | | |
| Charge Account | | | |
| Charge Account | | | |
| HOA Fees | | | |
| Self-Employment Taxes | | | |
| Health Insurance | | | |
| Food-Grocery Store/Housekeeping Supplies | $750.00 | $750.00 | $750.00 |
| Auto expenses | | | |
| Gasoline/Transportation | $50.00 | $50.00 | $50.00 |
| Medical (doctor, dentist, eye care, prescriptions) | $20.00 | $20.00 | $20.00 |
| Daycare | | | |
| Lunches/snacks, coffee, etc. | | | |
| Cable TV / Internet | | | |
| Clothing / Laundry / Dry Cleaning | $50.00 | $50.00 | $50.00 |
| Education expenses (including books) | | | |
| Church/religious donations | $8.00 | $8.00 | $8.00 |
| Other donations | | | |
| Pet expenses | | | |
| Personal Care | $20.00 | $20.00 | $20.00 |
| Allowances (including children) | | | |
| Cigarettes/beverages (including alcoholic) | | | |
| Income Taxes | $8.00 | $8.00 | $8.00 |
| Recreation / Entertainment | $20.00 | $20.00 | $20.00 |
| Clubs, sports hobbies | | | |
| Storage PODS | $214.99 | $214.99 | $214.99 |
| Gifts-Holidays, Birthdays, Anniversaries | | | |
| Emergency Savings | | | |
| Other Expenses | | | |
| | | | |
| **TOTAL EXPENSES** | $7,613.40 | $7,613.40 | $7,613.40 |
| | | | |
| **NET CASH FLOW** | $271,410.42 | $271,410.42 | $271,410.42 |

# EXHIBIT "D"

In Re: Ronald and Lola Palmer

Bankruptcy Case No. 9:18-bk-10894-DS

**Assets and Values from Bankruptcy Petition Schedules A & B**

| ASSET & FMV[1] | LIQUIDATION COSTS | SECURED DEBTS | EXEMPTION | NET TO ESTATE |
|---|---|---|---|---|
| Schedule A:<br><br>Property: 5269 Horizon Dr, Malibu, CA 90265<br><br>Estimated Value = $2,000,000.00 | Real estate sales commission and closing costs 8% = $160,000.00 | 1st Trust Deed: U.S. Bank $1,138,111.80<br><br>2nd Trust Deed: Carrington: $71,988.93<br><br>Total: $1,210,100.70 | $175,000.00 | $454,899.27 |

| ASSET & FMV[2] | LIQUIDATION COSTS | SECURED DEBTS | EXEMPTION | NET TO ESTATE |
|---|---|---|---|---|
| B-1<br>Household Goods/Furniture, $1,800.00 | | | $1,800.00 | -0- |
| B-2<br>Cash, $40.00 | | | $40.00 | -0- |
| B-4<br>Household Goods in PODS Storage $1,000.00 | | | $1,000.00 | -0- |
| B-5<br>Household Electronic Equipment, $1,300.00 | | | $1,300.00 | -0- |
| B-6<br>Household Prints/Reproduction Art, $400.00 | | | $400.00 | -0- |

[1] Value estimate is owner's opinion based on similar properties in the current market, on-line comparisons, and title reports.

[2] Value estimate is owner's opinion based on similar personal property, age of property and condition of property.

| | | |
|---|---|---|
| B-7 Sporting Goods, Photographic Equipment, $1,000.00 | $1,000.00 | -0- |
| B-8 Clothing, Shoes, Jackets, $500.00 | $500.00 | -0- |
| B-9 Rings, Watches, Costume Jewelry, $2,000.00 | $2,000.00 | -0- |
| B-12 Checking 4734, $434.00 | $434.00 | -0- |
| B-13 Checking 3491, $7,536.00 | $7,536.00 | -0- |
| B-13 Fidelity Investment 5211, $14,583.00 | $14,583.00 | -0- |
| B-23 Fidelity Investment 5195, $250.00 | $250.00 | -0- |
| B-25 2001 Toyota Solara, $900.00 (KBB Value) | $900.00 | -0- |
| B-25 Sole Proprietorship, 100% ownership $1.00 | $1.00 | -0- |
| B-25 MoneGnome, LLC, 100% ownership $0.00 | $0.00 | -0- |
| B-29 RFP Communications, Inc., 100% ownership $0.00 | $0.00 | -0- |
| B-31 Fidelity 401k 7086, $56.00 | $56.00 | -0- |

Net Liquidation Value of Non-Exempt Unencumbered Property:                                    **$0.00**

Less: Chapter 7 Administrative Expenses: (1st tier administrative fees)[3]

    Chapter 7 Trustee's Fee (no liquidation assets)                    $0.00
    Appraiser Fees                                                     $
    Trustee Counsel                                                    $
    Trustee Accountant                                                 $

        Subtotal:                                          $0.00

Less: Chapter 11 Administrative Expenses (2nd tier administrative fees)[4]

    Bankruptcy Counsel/ Rounds & Sutter LLP[5]           $37,789.50

        Subtotal                                $37,789.50

Total Chapter 7 Administrative fees (1st and 2nd tier)

                                      **$37,789.50**

---

[3] Under § 1129(a)(7), on the effective date, the plan has to distribute not less than the amount under a hypothetical chapter 7 liquidation. In a hypothetical chapter 7 liquidation, the administrative expenses would be paid off the top via § 726(a)(1).

[4] Under § 1129(a)(7), on the effective date, the plan has to distribute not less than the amount under a hypothetical chapter 7 liquidation. In a hypothetical chapter 7 liquidation, the chapter 11 administrative expenses would have tier administrative priority via § 726(b).

[5] For Bankruptcy Counsel, the fee is the amount reasonably estimated to remain due at the time of confirmation. The Debtor is paying these down during the pre-confirmation period as shown in the MORs.

**TOTAL TO UNSECUREDS IN CHAPTER 7:**

**$0.00**

| In re: | CHAPTER: **11** |
|---|---|
| **Ronald Frances Palmer**<br>**Lola Marie Palmer**<br><div align="right">Debtor(s).</div> | CASE NUMBER: **9:18-bk-10894-DS** |

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
**674 County Square Dr., Suite 108**
**Ventura, CA 93003**

A true and correct copy of the foregoing document entitled (*specify*):   **INDIVIDUAL DEBTORS' CHAPTER 11 PLAN OF REORGANIZATION** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF):** Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **January 8, 2020**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

**Greg P Campbell**    ch11ecf@aldridgepite.com,  gc@ecf.inforuptcy.com;gcampbell@aldridgepite.com
**Brian D Fittipaldi**    brian.fittipaldi@usdoj.gov
**Kelly M Kaufmann**    bknotice@mccarthyholthus.com, kraftery@ecf.courtdrive.com
**Anna Landa**    Anna@MarguliesFaithlaw.com, Helen@MarguliesFaithLaw.com; Vicky@MarguliesFaithLaw.com;
        Angela@MarguliesFaithLaw.com
**Lee S Raphael**    ecfcca@ecf.courtdrive.com
**John K Rounds**    jrounds@rslawllp.com, ecf@rslawllp.com
**Valerie Smith**    claims@recoverycorp.com
**United States Trustee (ND)**    ustpregion16.nd.ecf@usdoj.gov
**Kristin A Zilberstein**    bknotifications@ghidottiberger.com;gbadmin@ecf.courtdrive.com
☐ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On _ **January 8, 2020** _, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

**Chambers of Judge Deborah J. Saltzman**
**Edward R. Roybal Federal Building and Courthouse**
**255 E. Temple Street, Suite 1634**
**Los Angeles, CA 90012**

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, TELEPHONIC NOTICE OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on , I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| 1/8/2020 | Caitlin Rodriguez | |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                                                                                                     **9013-3.1.PROOF.SERVICE**